SO ORDERED.

SIGNED this 6 day of June, 2024.



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

**DUPREE FARMS, LLC**

     **DEBTOR**

**CASE NO:**
**18-00216-5-JNC**
**CHAPTER 11**

---

**DUPREE FARMS, LLC**

     **PLAINTIFF,**

**V.**

**PRODUCERS AGRICULTURE**
 **INSURANCE COMPANY, D/B/A PRO AG,**

     **DEFENDANT.**

**AP NO. 19-0164-5-JNC**

---

## MEMORANDUM ORDER ON MOTION TO DISMISS

The matter before the court is the Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by Producers Agriculture Insurance Company ("ProAg" or "Defendant") (A.P. Dkt. 151, the "Motion").[1] ProAg filed a memorandum in support of the Motion (A.P. Dkt. 152), and Plaintiff

---

[1] For reference purposes, citations marked "A.P. Dkt. __" refer to this Adversary Proceeding (19-0164), and citations marked "Dkt. __" refer to filings in the underlying chapter 11 case of the Debtor (18-00216).

Dupree Farms, LLC ("Dupree Farms" or "Plaintiff" or "Debtor") filed a response to the Motion (A.P. Dkt. 153, the "Response"). The court has reviewed the relevant pleadings and record in the case, and for the reasons stated herein, the Motion is denied.[2]

## **BACKGROUND**

This adversary proceeding involves a Whole-Farm Revenue Protection ("WFRP") Pilot Policy No. 2018-37-987-102949 (the "Policy") issued by ProAg to Dupree Farms on February 18, 2018. WFRP policies are a component of the federal crop insurance program, which is administered by the United States Department of Agriculture's Risk Management Agency ("RMA") and underwritten by the government-owned Federal Crop Insurance Corporation ("FCIC"). The policies, however, are sold by private companies such as ProAg, and the RMA partners with those private companies, known as approved insurance providers, to deliver and administer the program.

Dupree Farms commenced a voluntary Chapter 11 bankruptcy case by filing its chapter 11 petition (Dkt. 1) on January 16, 2018 (the "Petition Date"), Case No. 18-00216-5-JNC (the "Bankruptcy Case"). Its Second Amended Plan of Reorganization dated March 12, 2019 (Dkt. 292, the "Plan"),[3] was confirmed by order dated March 18, 2019 (Dkt. 297, the "Confirmation Order") following and incorporating the findings from the chapter 11 plan confirmation hearing conducted on March 7, 2019 (audio recording posted at Dkt. 288, the "Hearing Audio").

For all of crop year 2018, Dupree Farms operated under direct bankruptcy court supervision and jurisdiction. When the case was filed, the Debtor's ability to purchase crop

---

[2] For purposes of this order, all factual allegations made in the Complaint are treated as true, and other findings from the case record are either uncontested and deemed law of the case, or if contestable, are viewed in the light most favorable to Plaintiff. All such findings are specifically limited to the confines of this order and are not binding in the consideration of dispositive motions or trial of the case.

[3] Modifying by consent the prior amended plan filed September 11, 2018 (Dkt. 216), and incorporating the terms discussed as announced at the March 7, 2019, confirmation hearing.

insurance was in jeopardy because Debtor had not paid a past due premium notice of about $100,000 from a prior year. On January 26, 2018, a week after the Petition Date, the Debtor filed an Emergency Motion to Use Cash Collateral (Dkt. 41) seeking court authority to borrow up to $4,386,321.25 (the "PostPetition Loan") from Ag Resource Management/Agrifund, LLC ("ARM"), with a second lien granted to Getsco, Inc. ("Getsco"), to fund its 2018 postpetition farming operations. Specifically, the motion at paragraph 23, page 7, contemplates that 2018 crop insurance must be obtained as a condition of obtaining the ARM financing. The major prepetition secured lender, Regions Bank, objected (Dkt. 55) on the basis its prior liens on Debtor's assets were being unfairly primed. After three contested hearings (February 6 (audio at Dkt. 61), February 16 (audio at Dkt. 70), and February 23, 2018 (audio at Dkt. 76)), an Order Authorizing Use of Cash Collateral was entered on February 26, 2018 (Dkt. 78).[4]  Among other things, that Order allowed payment of the $100,000 premium past due on the 2017 crop insurance policy from the borrowed funds, thereby enabling the Debtor to bind and obtain the Policy.

The Debtor farmed the entire 2018 crop year while under bankruptcy court supervision. A preliminary insurance claim was communicated to ProAg in the fall of 2018, prior to the plan confirmation hearing.  A series of communications between ProAg ensued, resulting in ProAg determining that the Policy would pay an amount lower than allegedly promised by ProAg's agent at policy acquisition and as relied upon in Dupree Farm's 2018 planting decisions. It had informed the major prepetition creditors (primarily Regions Bank and Getsco) that litigation might be required, and it filed an application with the court to employ special litigation counsel (Dkt. 248). The court entered the order of January 18, 2019 (Dkt. 260), approving employment of attorney Kevin L. Sink of Raleigh, North Carolina, to act as special counsel "with respect to claims against

---

[4] An updated budget was submitted by the Debtor later that day, as to which no objection was filed, resulting in the entry of a final order approving postpetition financing on March 5, 2018 (Dkt. 95).

[ProAg] in connection with . . . claims or notices of loss . . . relating to Whole Farm Revenue Protection for 2017 and 2018."[5]

Despite this brewing dispute, the chapter 11 case proceeded to plan confirmation on March 7, 2019 (the "Plan Hearing"). At the Plan Hearing, counsel for Dupree Farms, Richard Sparkman, announced that prepetition secured creditor Regions Bank had changed its position and accepted the plan as modified, agreeing to defer the past due balance on its prepetition loan (i) for one year or (ii) until the 2018 crop insurance dispute resolved, whichever occurred first.[6]  In response, the court inquired whether the anticipated action against ProAg had been filed. Mr. Sparkman replied that an investigation and discussions were proceeding, that ProAg adjusters were formally reviewing the claim, and a final notification had not been rendered; in other words, litigation was contemplated but not yet ripe (Hearing Audio, 11:00 to 12:15). During cross examination conducted by Regions Bank counsel, the principal officer of Dupree testified that if net proceeds were recovered from ProAg under the claim or as a result of litigation, those funds could be used to fund the plan, including the annual payments due to Regions Bank and Getsco (Hearing Audio, 48:50 to 49:40).[7]

During the Plan Hearing, when discussing postpetition and postconfirmation financing, Mr. Sparkman reported, and a member-manager of the Debtor later confirmed in his testimony, that in the 2018 crop year (postpetition but preconfirmation), the Debtor planned to farm and then

---

[5]  The potential claims against ProAg were mentioned many times in chapter 11 case hearings held prior to confirmation. For example, Mr. Sparkman discussed the potential litigation at Status Conferences attended by creditor attorneys on August 2, 2018 (See Dkt. 202) and January 15, 2019 (See Dkt. 255).

[6]  Based on the plan language there may be a future dispute concerning whether net funds are due to Regions (class 9) or unsecured creditors (class 13), but that matter is not before the court today.

[7]  Dupree Farms submitted declarations from respective counsel for Regions Bank and Getsco (A.P. Dkt. 153) in support of its opposition to the Motion. The court has deemed those Declarations immaterial to the extent they set forth information not already properly in the case record; therefore, the Declarations are not considered herein (*See* Order, Dkt. 163).  However, testimony, proffer, and other evidence of record at the confirmation hearing and before are properly available for consideration in this matter.

attempted to farm 3,137 acres consisting of soybeans, sweet potatoes, tobacco, watermelons, and broccoli.[8] Dupree Farms operated throughout most of 2018 with an understanding, alleged to be based on ProAg agents' assurances, that expanded coverage under the Policy would be in effect and extended to all of its 2018 crops, including rotation on the same farm acreage of the broccoli and watermelon crops during the 2018 crop year. Dupree Farms alleges it relied on the assurance of the ProAg agent that if it planted this specific crop mix in the specific rotation then it would qualify for the 1.35 "Expanded Operations Factor" as that term is defined in the Policy.[9]

The summer of 2018 turned out to be a notoriously tough farming year in eastern North Carolina due to a recurring cycle of drought and excessive rainfall. Dupree Farms lost virtually all of its broccoli and watermelon rotational crops. Because the estate's 2018 farming operation failed to generate the expected farm revenue guaranteed (or thought by the Debtor to be guaranteed) under the Policy, Dupree Farms submitted a claim under the Policy expecting coverage at the 1.35 Expanded Operations Factor (Hearing Audio, 11:00 to 12:15). In its letter dated November 16, 2018, (the "First Denial Letter"), ProAg first informed Dupree Farms of its position that the Policy must be read restrictively with respect to the maximum allowable Expanded Operations Factor applicable under the Policy and would be calculated at 1.17 rather than the 1.35 expected by Dupree Farms.

As of the Plan Hearing in March 2019, Dupree Farms reported that it was still communicating with ProAg concerning the coverage dispute in an effort to resolve the matter short of litigation. The formal crop year 2018 claim of loss dated April 29, 2019, was labeled by ProAg as Claim No. 18011474.25 (the "Claim"). On May 31, 2019, Dupree Farms was notified that

---

[8] This crop plan is also listed in the 2018 crop insurance policy schedule attached to the complaint.
[9] **Expanded operation factor** - A factor that is used to calculate the expanded operation adjusted revenue for farm operations that are physically expanding.

ProAg, using the lowered 1.17 expansion factor, had made a firm determination that the "Whole Farm Approved Revenue" was $4,581,522 with a corresponding "Insured Revenue" for Dupree Farms set at $3,894,319.26, yielding a final indemnity payment of $691,557. Dupree Farms contested the ProAg conclusion, asserting coverage calculated at a 1.35 Expanded Operations Factor. It says the higher factor produces a total insurance recovery of $1,226,720, a difference of $535,163 when compared to the allowed $691,557.  ProAg denies that it remains liable to Dupree Farms for 2018 crop loss claims for any additional amount.

Dupree Farms initiated this postconfirmation adversary proceeding on November 11, 2019, by filing a complaint (A.P. Dkt. 1) seeking to recover damages from ProAg for the reduced insurance coverage under four state law causes of action, being negligent misrepresentation, intentional misrepresentation, unfair and deceptive trade practices, and punitive damages. ProAg answered (A.P. Dkt. 10) on January 30, 2020, denying any further liability. Neither party sought a jury trial. On November 5, 2019, Dupree Farms commenced a parallel arbitration proceeding (A.P. Dkt. 18, Demand for Arbitration Claim No 18011474, the "Arbitration") against ProAg, as required under the Policy and implementing regulations. On April 15, 2020, Dupree Farms and ProAg jointly submitted, and the court approved, a consent order (A.P. Dkt. 19) staying this adversary proceeding pending a decision in the Arbitration.

In the Arbitration, both Dupree Farms and ProAg requested that the FCIC interpret which of the competing Expansion Factor interpretations should be utilized by the arbitrator in calculating insurance coverage under the Policy.[10]  The FCIC agreed with ProAg's position. On the basis of that interpretation, which is binding on the arbitrator under 7 C.F.R. § 400.766(b)(2), ProAg

---

[10] An FCIC interpretation and an FCIC determination are different matters. *See Williamson Farm v. Diversified Crop Ins. Servs.,* 917 F.3d 247, 256 (4th Cir. 2019) ("[A]n FCIC *interpretation* of the meaning of disputed policy provisions is a different request -- one which arises at a different time and in a different proceeding -- than an FCIC determination that an agent failed to comply with the terms of the policy.")

submitted a motion for summary disposition. On September 10, 2021, the arbitrator granted that motion and entered a final award (A.P. Dkt. 38, the "Arbitration Award") in favor of ProAg upholding its claim calculations based on the 1.17 Expansion Factor and found that Dupree Farms had already received the full measure of indemnity payable under the Policy. However, the Arbitration Award further specified, citing to FAD-211,[11] that the arbitrator was without authority to consider "extra-contractual" claims and those grounded in "equitable estoppel," which the FCIC defines to include legal claims arising in tort such as misrepresentations, negligence, etc., such as those asserted in this action by Plaintiff. *See* Arbitration Award at page 25, citing FAD-211 and FAD-282. The arbitrator further notes, "Dupree's claim for 'any extra-contractual damages, including consequential damages and punitive damages, available in judicial review' are not within the scope of this arbitration as the Panel has no authority to consider those claims." Arbitration Award, at 28. Following entry of the Arbitration Award, on October 19, 2021, Dupree Farms moved to amend (A.P. Dkt. 42) its original complaint to add an additional claim for "judicial review" as provided in Section 33(c) of the Policy. Shortly thereafter, on October 21, 2021, ProAg filed a motion to confirm the Arbitration Award (A.P. Dkt. 43) and a separate motion for summary judgment (A.P. Dkt. 44).

Plaintiff responded in opposition to both motions (A.P. Dkts. 51 & 52). On January 6, 2022, the court confirmed the Arbitration Award (A.P. Dkt. 76; the "Arbitration Confirmation") to the extent the summary disposition determined ProAg had paid Dupree Farms the full indemnity limit under the Policy. The Arbitration Confirmation, standing alone, does not bar "extra-contractual" claims excluded from the Arbitration Award as those matters are outside the scope of the

---

[11] FADs are Final Agency Determinations, which, according to the regulations are binding on participants in the Federal Crop Insurance Program. 7 C.F.R. § 400.766. FADs are available on the USDA website at https://www.rma.usda.gov/Policy-and-Procedure/Final-Agency-Determinations (last accessed June 6, 2024).

Arbitration Award and can only be pursued in a court setting, as contemplated by the applicable regulations and the Policy.[12]

The FCIC's regulations at 7 C.F.R. Part 400 Subpart P provide that, as a "condition precedent" to pursing a claim for extra-contractual damages against an approved insurance provider based on actions or omissions arising in the administration of a federal crop insurance policy, a policyholder must first obtain a determination of non-compliance from the FCIC. 7 C.F.R. § 400.352; s*ee J.O.C. Farms, LLC v. Fireman's Fund Ins. Co.*, 737 Fed. Appx. 652, 655 (4th Cir. 2018).[13] Defendant maintains that these claims have been barred in the course of the FSA review process.[14] Plaintiff contends such a determination is unnecessary for this court to adjudicate its claims.

_____

[12] The Judicial Review requested herein and contemplated by the Policy and the implementing regulations in this matter are separate and distinct from any review of an arbitration award as contemplated by the Federal Arbitration Act. 9 U.S.C. § 1 et seq. Therefore, the Supreme Court case of *Badgerow v. Walters,* 596 U.S. 1 (2022) and the Fourt Circuit's recent extension of *Badgerow*'s holding to cases over which the federal court had original jurisdiction and had merely stayed the action pending arbitration, in *SmartSky Networks, LLC v. DAG Wireless, LTD.,* 93 F.4th 175 (4th Cir. 2024), are inapplicable to the judicial review in this matter.

[13] The pertinent regulations prohibit state, local governmental entities, and non-governmental entities, from:

> (4) Levy[ing] fines, judgments, punitive damages, compensatory damages, or judgments for attorney fees or other costs against companies, employees of companies including agents and loss adjustors, or Federal employees arising out of actions or inactions on the part of such individuals and entities authorized or required under the Federal Crop Insurance Act, the regulations, any contract or agreement authorized by the Federal Crop Insurance Act or by regulations, or procedures issued by the Corporation (Nothing herein precludes such damages being imposed against the company if a determination is obtained from FCIC that the company, its employee, agent or loss adjuster failed to comply with the terms of the policy or procedures issued by FCIC and such failure resulted in the insured receiving a payment in an amount that is less than the amount to which the insured was entitled).

7 C.F.R. § 400.352

[14] This issue does not affect subject matter jurisdiction but rather relates to the pending motion for summary judgment, which will be ruled on in due course.

ProAg next sought summary judgment in this action on the procedural basis that Dupree had not timely obtained the required FCIC determination. Dupree responded by requesting the FCIC authorize pursuit of extra-contractual damages. Finding that the summary judgment motion was premature, this court denied ProAg's motion for summary judgment without prejudice to its right to file further dispositive motions. (A.P. Dkt. 76). On January 7, 2022, Dupree Farms filed an amended complaint adding the "judicial review" component (A.P. Dkt. 77). ProAg filed a timely amended answer (A.P. Dkt. 79). A discovery scheduling order (A.P. Dkt. 84) was subsequently entered.

On July 20, 2022, the FCIC notified Dupree Farms of its finding that it had no authority to issue a determination under Subpart P, specifically because there is no provision in the Policy permitting such a determination or allowing a farmer to pursue such damages despite the regulations contemplating such a policy provision and other policies having contained such a provision. Dupree Farms appealed this determination to the USDA National Appeals Division ("NAD"). On July 29, 2022, Dupree Farms again moved to amend its pleadings, this time to conform its allegations to evidence deduced during discovery. On August 22, 2022, the court entered an order staying all discovery deadlines until January 2023 to allow Dupree's appeal from the FCIC's "no authority" ruling to proceed to the USDA Farm Service Agency (Dkt. 99).

On August 26, 2022, with the court's approval, a consent order (A.P. Dkt. 101) was entered allowing Plaintiff leave to amend. Dupree Farms filed its Second Amended Complaint on August 31, 2022 (A.P. Dkt. 102, the "Second Amended Complaint"), again alleging liability of ProAg for (1) negligent misrepresentation; (2) intentional misrepresentation; (3) violation of the North Carolina Deceptive Trade Practices Act; and (4) judicial review. ProAg filed its amended answer on September 30, 2022 (Dkt. 105). On January 23, 2023, Dupree Farms moved to cancel the

9

litigation stay and proceed to prosecute this adversary proceeding, which request was granted on February 21, 2023 (A.P. Dkt. 118).

Soon thereafter, an administrative judge with the NAD upheld the FCIC "no authority finding" by its order of March 24, 2023. (A.P. Dkt. 128, Ex. 9). Dupree Farms appealed the administrative judge decision to the NAD Director, Frank M. Wood.  On June 2, 2023, Director Wood upheld the NAD administrative judge's appeal decision, noting that his determination was "a final order of the Department of Agriculture and concludes all administrative processing of [the] appeal." (A.P. Dkt. 128, Ex. 10.)  On July 27, 2023, ProAg revived its motion for summary judgment, arguing that Dupree Farm's claims herein are barred and preempted based on the final NAD decision and the applicable regulations. By order dated October 18, 2023 (A.P. Dkt. 145), this matter was sent to mediation, with the motion for summary judgment held in abeyance.  On December 7, 2023, the mediator reported that the mediation resulted in an impasse.

On a parallel track, following the final NAD decision, on June 30, 2023, Dupree Farms filed a complaint in the United States District Court for the Eastern District of North Carolina against defendants United States Department of Agriculture, RMA, and FCIC (collectively the "Agency Defendants") (*Dupree Farms v. USDA, et al.*, 5:23-CV-360-M-RJ, the "District Court Case").  In that action, Dupree Farms contends it has exhausted all its administrative remedies and seeks de novo review as a matter of right pursuant to 5 U.S.C. § 706, asserting that the refusal of the Agency Defendants to issue a determination is arbitrary and capricious, contrary to controlling law, and unsupported by substantial evidence. On August 24, 2023, Dupree Farms filed a motion for direct reference of that matter to the bankruptcy court (Dist. Ct. Dkt. 8)[15] for joinder here. The Agency Defendants objected, and on October 20, 2023, that motion was denied by the District

---

[15] For reference purposes, citations marked "Dist. Ct. Dkt. ___" refer to the District Court Case (5:23-CV-360-M-RJ).

Court (Dist. Ct. Dkt. 16).    On November 16, 2023, in the District Court Case, the Agency Defendants filed a motion to dismiss and for judgment on the pleadings, which matter remains pending.  Meanwhile, in this adversary proceeding, on January 19, 2024, ProAg filed the Motion currently before the court, which is ripe for ruling.

## STANDARD OF REVIEW

Defendant moves to dismiss this adversary proceeding pursuant to Rule 7012(b)(1) of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 12 of the Federal Rules of Civil Procedure.  It argues the bankruptcy court lacks subject matter jurisdiction over the claims in this adversary proceeding because they were brought post confirmation. Plaintiff responds that the claims have a sufficiently close nexus to the underlying chapter 11 bankruptcy proceeding to establish "related to" subject matter jurisdiction under 28 U.S.C. § 1334(b) and prevailing caselaw.

## ANALYSIS

### A.  BANKRUPTCY COURT JURISDICTION GENERALLY

#### 1.  Source

As with all federal courts, United States Bankruptcy Courts are courts of limited jurisdiction. Bankruptcy courts derive subject matter jurisdiction from the district courts, which "have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a); *see also* 28 U.S.C. § 157(a), (b)(1). "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C.  §  1334(b).  Thus,  whether  preconfirmation  or  postconfirmation,  bankruptcy  court jurisdiction must be traced to 28 U.S.C. § 1334(b).

Under that statute, in bankruptcy cases, the federal district court, and derivatively the bankruptcy court by reference, hold subject matter jurisdiction only over civil proceedings that (i)

arise under, (ii) arise in, or (iii) are related to a bankruptcy case. 28 U.S.C. § 1334(b). Congress intended to grant bankruptcy courts comprehensive jurisdiction over matters involving or affecting bankruptcy estates so that one court, the bankruptcy court, could deal "efficiently and expeditiously with all matters connected to the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (internal citations omitted). Because federal courts require statutory and constitutional jurisdiction to hear proceedings, a "bankruptcy court always has an obligation to examine its jurisdiction to hear postconfirmation adversary proceedings." *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 839 (4th Cir. 2007). This responsibility to review subject matter jurisdiction can "be raised at any time by the parties or by the court itself*." In re Medlin*, 269 B.R. 591, 592–93 (Bankr. E.D.N.C. 2001) (citations omitted); *In re Woods*, 130 B.R. 204, 206 (W.D. Va. 1990) ("It has been long established that a federal court may, at any time during the pendency of a case, either on a motion of one of the parties or its own motion, consider whether it has subject matter jurisdiction of that case."). Moreover, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## 2. Burden of Proof

The party asserting jurisdiction has the burden of proving that subject matter jurisdiction exists. *Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991); Grathwol *v. Coastal Carolina Developers, Inc.* (*In re Grathwol*), 505 B.R. 201, 203 (Bankr. E.D.N.C. 2014) (citations omitted) ("The burden of showing 'related to' jurisdiction is on the party asserting it."). A court may look beyond the pleadings to determine subject matter jurisdiction:

> When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* The district court should grant the Rule 12(b)(1)

12

motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

### 3. Related to Jurisdiction

Plaintiff does not argue that the subject claims "arise under" the Bankruptcy Code as no claim is "based on any right expressly created by Title 11." V*alley Historic*, 386 F.3d at 835, quoting *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003). Further, Plaintiff does not argue the claims "arise in" the bankruptcy, as none of the claims asserted here "would have no practical existence but for the bankruptcy." *In re Mitchell*, 11-08880-8-SWH, 2018 WL 1577710 at *6 (Bankr. E.D.N.C. 2018) (quoting *Bergstrom v. Dalkon Shield* (*In re A.H. Robins Co.*), 86 F.3d 364, 372 (4th Cir. 1996) (holding the bankruptcy court did not have subject matter jurisdiction over state law claims based on postpetition conduct that could be brought in state court and were not dependent on the bankruptcy case). Rather, Plaintiff's claims hang solely on the third peg of "related to" the bankruptcy case.  28 U.S.C. § 1334(b).

In determining whether a non-core matter is "related to" the underlying bankruptcy case sufficiently to establish jurisdiction, in preconfirmation matters the bankruptcy court examines "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor,* 743 F.2d at 994. "Related to" jurisdiction is not limitless *Binder v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 163-64 (3d Cir. 2004), but is very broadly interpreted in a preconfirmation context. *Canal Corp. v. Finnman,* 960 F.2d 396, 403 (4th Cir. 1992); *In re Titan Energy, Inc.* 837 F.2d 325, 330 (8th Cir. 1998) ("[E]ven a proceeding which portends a mere contingent or tangential effect on a debtor's estate meets the broad jurisdictional test articulated in *Pacor*.")  On the other hand, as is discussed below, the test

for postconfirmation related to jurisdiction is more stringent than it would be if the adversary proceeding were filed prior to plan confirmation.

### 4. Postconfirmation Jurisdiction

Subject matter jurisdiction for bankruptcy courts narrows after plan confirmation. *Resorts Int'l,* 372 F.3d at 165-66 (holding that in a post confirmation context, the bankruptcy court did not have "related to" jurisdiction in adversary proceedings for non-core, purely state law claims between non-debtors where the claims had no "close nexus" with the administration of a confirmed chapter 11 bankruptcy plan).

> As stated, the jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a *close nexus* to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

*Id.* at 168-69 (emphasis added).

The "close nexus" test from the Third Circuit has been adopted by the Fourth Circuit as a "logical corollary of 'related to' jurisdiction" analysis in the postconfirmation stage. *Valley Historic,* 486 F.3d at 837. "Analytically, [the close nexus test] insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction." *Id*. As a consequence, in determining jurisdiction in a post confirmation setting:

> any civil proceeding must have a "close nexus" to the bankruptcy in order to be "related to" the bankruptcy proceedings. *Valley Historic*, 486 F.3d at 836–37; *see Resorts Int'l*, 372 F.3d at 167. A close nexus typically exists if the civil proceeding is one which "affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Resorts Int'l*, 372 F.3d at 167.

*Keesee v. Mitchell*, 623 B.R. 402, 412 (E.D.N.C.), *aff'd,* 829 F. App'x 628 (4th Cir. 2020).

In *Valley Historic*, the Fourth Circuit found that no "close nexus" existed between the debtor's claims for relief and its plan, reasoning that "no conceivable bankruptcy administration

purpose [would be] served by the Debtor's adversary proceeding because the plan made no provision for the use of any recovery from the adversary proceeding but instead provided for the satisfaction of the Debtor's obligations 'entirely from post-petition rents and earnings....'" *Id.* at 837. When that adversary proceeding was brought, the plan had been confirmed over thirty months prior and had already been substantially consummated. In fact, the creditors had already been paid all they were entitled to recover under the confirmed plan and therefore the outcome would have no effect on them. The fact that a cause of action arose while the chapter 11 proceeding was open did not automatically give the bankruptcy court subject matter jurisdiction, especially where creditors had already been paid under the applicable plan. *Id.* at 836.

### B. THE PLAN OF REORGANIZATION

ProAg argues this adversary proceeding is not sufficiently "related to" the bankruptcy to establish postconfirmation jurisdiction.  It points to the fact that the Plan makes no specific reservation of jurisdiction for this action and that any recovery is not earmarked for a particular creditor class. Despite the record up to and including the confirmation hearing being replete with discussions of this action, because the Plan is largely silent, ProAg contends the failure to include a provision for specific retention of this adversary proceeding is fatal.

To examine this position, the starting point is the Plan. Article VIII contains the material provisions regarding reservation of causes of action.[16]  The retention provision in the Plan only

---

[16] Article VIII of the Plan entitled "Causes of Action" provides in relevant part:

> The Debtor may pursue any causes of action arising under §§ 544, 545, 547, 548, 549, 550, or 553(b) of the Bankruptcy Code, or under any similar provisions of applicable state or federal law to recover any preferences or fraudulent conveyances from any person. Funds recovered as a result of such actions shall be applied first in reimbursement of attorneys' fees and other costs of such actions. The remainder shall be the property of the Debtor.

generically preserves the Debtor's right to pursue causes of action, being (a) those arising under the avoidance and recovery of estate assets provisions of chapter 5 of the Bankruptcy Code, and (b) non-core causes of action *presently pending* in state and/or federal court in which the Debtor is plaintiff. Since neither of these provisions covers the claims at issue in this adversary proceeding, ProAg contends the bankruptcy court lacks jurisdiction over these claims.

In response, Dupree Farms maintains that despite the lack of specific reservation language in the Plan, a close nexus exists, citing to Plan Article XIV.[17]  Plaintiff also relies on the record from the Plan Hearing and prior hearings which includes multiple discussions of the potential for litigation. For example, following receipt of the First Denial Letter on December 18, 2018, Plaintiff filed an Application to Employ Mr. Sink as special counsel expressly to pursue the present claims against ProAg. Dupree Farms further asserts that during the confirmation process, as evidenced by

---

All adversary proceedings to recover preferences and fraudulent conveyances or to otherwise implement the terms of this Plan and all objection to claims, if any, shall be filed within one hundred twenty (120) days of the Effective Date of this Plan.

Non-core causes of action presently pending in state and/or federal court in which the Debtor is plaintiff may continue to be pursued by Debtor at its sole option.

(The Plan, Article VIII).

[17] Article XIV of the Plan does provide general "Retention of Jurisdiction" as follows:

The Bankruptcy Court shall retain jurisdiction of these proceedings pursuant to and for the purposes of §§ 105(a) and 1127 of the Code and for, without limitation, the following purposes, *inter alia*:
…
4.  to determine all controversies and disputes arising under or in connection with the Plan;
5. to determine all applications, adversary proceedings and litigated matters pending on the Confirmation Date;
…
8. to determine all disputes regarding property of the estate; …

(Plan, Article XIV).

16

lengthy comments of counsel on the subject at the Plan Hearing and prior hearings, and the direct and cross examination of Mr. Dupree at the Plan Hearing, creditors participating in the confirmation process understood and relied on the chance of recovery from ProAg.[18]  These claims were forecast as a key component of Dupree Farm's future ability to meet its financial obligations under the Plan. Hiring an attorney to pursue the claims demonstrates intent to use any recovery to benefit the bankruptcy estate and apply net recovery to creditors. *See* pp. 3—6 supra.  This direct link between the outcome of the Adversary Proceeding and success of the Plan as measured by effect on plan performance ability satisfies the close nexus test.

### C.   THE AVADO BRANDS FACTORS

#### 1.   The Six Factor Test

When jurisdiction is not obvious in a postconfirmation action*,* bankruptcy courts of this circuit have previously adopted,[19] and this court will use, a six-factor test to analyze whether a close nexus is presented:

> (1) When the claim at issue arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state law or bankruptcy law applies; and (6) indices of forum shopping.

*Avado Brands, Inc. v. Dupree et al*, 358 B.R. 868, 878 (Bankr. N.D. Tex. 2006) (*citing In re Encompass Servs. Corp*., 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006).

#### 2.   Analysis of Test Factors

Considering the first *Avado* factor, the material allegations for each claim stem from alleged misrepresentations regarding the coverage terms, specifically the applicable expansion

---

[18]  ProAg does not deny that it was aware of the claims, nor did it object to plan confirmation.

[19]  The same test for postconfirmation jurisdiction was used by a bankruptcy court sitting in this circuit in *In re Air Cargo, Inc.*, 401 B.R. 178 (Bankr. D. Md. 2008), and previously by this court in *Waldrep v Estate of Nusbaum et al*., AP 21-00078-JNC (Dkt. 54, Oct 13, 2022).

factor, under the Policy for crop year 2018 postpetition but preconfirmation. Relevant to the fourth *Avado* factor as well, a condition of postpetition financing was acquisition of a suitable crop insurance policy petition. This court was asked to and in fact approved acquisition of the Policy by the Debtor in the course of the chapter 11 case.  Additionally, unlike many cases where a close nexus was not found, this is not a postconfirmation dispute between non-debtors with no discernable effect on debtor and plan regardless of the outcome of the case.  *See, e.g., New Horizon of N.Y., L.L.C. v. Jacobs*, 231 F.3d 143, 155 (4th Cir. 2000). Unlike *Valley Historic* or *Resorts Int'l*, here the cause of action arose preconfirmation. Consequently, the court finds that the first and fourth factors weigh strongly towards finding a close nexus.

Moving next to consideration of the second *Avado* factor, subject matter jurisdiction as defined in 28 U.S.C. § 1334 is absolute; it cannot be created by court order or agreement of the parties via a confirmed bankruptcy plan. *See Valley Historic*, 486 F.3d at 847, quoting *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("Debtor cannot 'write its own jurisdictional ticket'"). The Fourth Circuit has recognized this concept, stating "[N]either the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction is otherwise lacking." *Valley Historic,* 486 F.3d at 837 (citing *New Horizon of N.Y., L.L.C. v. Jacobs*, *supra*). *See also In re Ohnmacht*, 09-08106-8-DMW, 2017 WL 5125531, at *6 (Bankr. E.D.N.C. Nov. 3, 2017).

On the other hand, good plan language can preserve and clarify for notice purposes already existing jurisdiction postconfirmation. ProAg contends that the issue here is that the Plan, as discussed above, speaks only generally and is silent with respect to this particular adversary proceeding. A close examination of paragraphs 4 and 8 from Article XIV of the Plan reveals Debtor's intent, incontestably known to ProAg and other interested parties prior to and at

18

confirmation, to retain jurisdiction over this heavily discussed postpetition, preconfirmation cause of action. Among other things, Article XIV retains jurisdiction to "(4) determine all controversies and disputes arising under or in connection with the Plan;" and (8) to determine all disputes regarding property of the estate.[20]

This claim was a distinct "controversy and dispute" known not just to the Debtor and its creditors at the moment of confirmation, but to ProAg as well. Litigation by ambush has not been perpetrated here; ample evidence is presented in the chapter 11 case record to reflect that creditors not only were aware of this potential claim and recovery of funds prior to confirmation but also relied on it in supporting confirmation. The action itself and any recovery is property of the estate regardless of whether it has been earmarked for any particular creditor.[21]  Thus, the second factor, under the unique facts and circumstances of this case, falls in favor of jurisdiction.

Next, the court must consider whether the Plan was substantially consummated at the time of commencement of the adversary proceeding on November 11, 2019.  In analyzing substantial consummation for purposes of determining related to jurisdiction, the controlling moment is when an adversary proceeding is filed, not some later arbitrary point in time. *See e.g., Avado Brands, Inc.,* 358 B.R. at 878 (looking to whether the adversary proceeding was filed before or after substantial consummation)*; Encompass Servs. Corp.*, 337 B.R. at 875 (examining two-year timespan between the plan effective date and filing the adversary proceeding to determine whether

---

[20] Already pending causes of action are addressed in subparagraph 5 ("to determine all applications, adversary proceedings and litigated matters pending on the Confirmation Date"), but this case was in the gray area of a known cause of action germane to plan funding, yet not quite ripe at the moment of plan confirmation.

[21] Once a court has jurisdiction over a matter, it holds and continues to hold jurisdiction over any distribution or restrictions concerning the net recovered proceeds recovered as well.

substantial consumption occurred); *Valley Historic, 486 F.3d* at 839 (holding plan was substantially consummated prior to filing the adversary proceeding).

According to the Bankruptcy Code,

 **(2)** "substantial consummation" means—

> **(A)** transfer of all or substantially all of the property proposed by the plan to be transferred;
> **(B)** assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
> **(C)** commencement of distribution under the plan.

11 U.S.C. § 1101.

The Plan further defines "Substantial Consummation" in this particular case as:

> "Substantial Consummation" shall mean the time the reorganized Debtor has completed liquidation of all properties required to be sold pursuant to terms of the Plan, if any; and has made initial payment to each applicable class under the Plan.

Plan 1.20.

Dupree Farms asserted at the hearing that the adversary proceeding was filed well prior to substantial consummation of the Plan. ProAg made an argument that the Plan had already been substantially consummated at present day, but it did not address the question of whether substantial consummation had already occurred by the time of commencement of the adversary proceeding. "The [jurisdictional] inquiry must focus on whether the Court had jurisdiction over this adversary proceeding at the time the Complaint was filed." *In re Oxley Dev. Co., LLC,* 493 B.R. 275, 285 (Bankr. N.D. Ga. 2013) (emphasis added).

In *Grathwol*, 505 B.R. 201, 203 (Bankr. E.D.N.C. 2014), the court dismissed three state law postpetition adversary proceedings for lack of related to subject matter jurisdiction under the *Avado* factors, finding two items to be particularly persuasive. First, the *Grathwol* plan did not

specifically reserve the state law "related to" claims in the language of its plan. However, unlike the present situation, the *Grathwol* debtor apparently did not discuss the claims (or in all probability even know of their validity), and no *Grathwol* creditor knew about or relied on the existence of the claims at the time of plan confirmation. Once validly filed, jurisdiction is not lost by subsequent substantial consummation. *See, e.g., Freeport–McMoRan, Inc. v. K N Energy, Inc*., 498 U.S. 426, 428, 111 S.Ct. 858, (1991) ("[I]f jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.")

Here, the record demonstrates that the primary creditors (Regions Bank and Getsco among others) relied on this action being brought if the matter was not first resolved amicably. Unlike *Grathwol*, the record confirms substantial consummation had not occurred by the time this adversary proceeding was filed. The first minor distribution to the unsecured class had been made the previous July, but the major point of the Plan—treatment of the two largest creditors (Regions Bank and Getsco)—had barely begun. They retained largely unperformed claim treatment rights and would have strenuously objected to a motion for substantial consummation.

This third Avado factor therefore lines up in support of subject matter jurisdiction. Material creditors retained rights under the Plan, a fact not disputed when the adversary proceeding was filed. Because substantial consummation had not occurred when this case was filed, the third factor weighs substantially in favor of retained jurisdiction.

As the fourth factor has been adequately addressed above, the court turns next to the fifth factor of whether state law or bankruptcy law applies. At first blush, this factor technically weighs against jurisdiction since the present causes of action for misrepresentation and unfair and deceptive trade practices are state law claims. However, this matter involves a federal crop insurance policy obtained during the bankruptcy case by order of this court and subject to complex

federal regulations that must be interpreted. Thus, while the technical causes of action are state law claims, federal and bankruptcy law are intertwined here to a high degree.  The weight of this factor is limited by the particular circumstances of this case.

Finally, in answer to the sixth factor, there is no indication of improper forum shopping and neither party raises that issue. The motion to employ Mr. Sink, filed well before confirmation, indicates Debtor always intended to pursue the claims in bankruptcy court.

### 3. Determination Under the Test

The present case is factually distinguishable from *Valley Historic*, where that adversary proceeding was filed more than two years postconfirmation; apparently was not known to exist at plan confirmation and therefore could not be a consideration of creditors in supporting a plan; and the plan was substantially consummated well before that adversary proceeding was filed. In fact, in *Valley Historic,* the debtor had already paid all allowed claims of its creditors prior to filing the adversary proceeding. *Valley Historic*, 486 F.3d at 837.  Because the creditors had already been paid there, the bankruptcy estate (as opposed to the surviving debtor entity) had no interest in the outcome.  The *Valley Historic* court accordingly held that it was impossible for a "close nexus" between the adversary proceeding and the confirmed plan to exist. In contrast, here, the adversary proceeding was filed just months after confirmation, because the causes of action were known at the time of confirmation but held up in the Policy and Claim determination process for another two to three months.

Additionally, counsel for creditors understood during the confirmation process that this claim was being diligently pursued through the insurance company's claim process. Any proceeds recovered would be used towards funding the Plan, as all creditors have not been paid and indeed may ultimately be interdependent on receiving a net recovery in this case.

This adversary proceeding is also distinguishable from *In re Resorts Int'l, Inc.,* 372 F.3d 154. *Resorts Int'l* involved a litigation trust established in the confirmed plan bringing an accounting malpractice action against the accounting firm that provided tax advice and account services to the trust. All of the material actions leading to the alleged malpractice occurred postconfirmation, and the adversary proceeding was brought almost seven years following plan confirmation.   In contrast, the adversary proceeding here was brought a few months after confirmation and involved entirely preconfirmation actions concerning the Policy for 2018 crops farmed during the pendency of the bankruptcy case. Dupree Farms, a debtor-in-possession as defined in section 1101 of the Bankruptcy Code, remained subject to bankruptcy court oversight and scrutiny during the chapter 11 process.

 In fact, the Order Approving Post-Petition Financing entered March 5, 2018 (Dkt. 95), approved the specific crop mix Debtor intended to grow in 2018 and assigned as collateral net crop insurance proceeds to postpetition financing secured creditor.   Testimony was heard at the Plan Hearing concerning the existence of the claim, that an adversary proceeding was looming if not soon resolved, and that any net proceeds would be used to partially fund the Plan.   Creditors in this matter were put on notice of the existence of the claim as an important asset, and the record shows they relied on it. The Defendant, meanwhile, while aware of the controversy, failed to appear at the Plan Hearing to contest Debtor's postpetition rights.

In sum, the *Avado* factors weigh in favor of jurisdiction and demonstrate that related to jurisdiction exists in this matter.   The case record demonstrates that parties relied on the impending adversary proceeding, and that this adversary proceeding is not the product of ambush. The claims here, while sounding in state tort law, involve a myriad of federal regulations and interpretation of

23

a federal agency sponsored insurance policy issued under this court's supervision during the course of the preconfirmation chapter 11 proceedings.

## CONCLUSION

Considering the totality of the circumstances, a close nexus exists between this adversary proceeding and the chapter 11 case and its confirmed plan. Therefore, this court holds sufficient related to jurisdiction over the claims in this adversary proceeding. For the foregoing reasons, the Motion is **DENIED**.

## END OF DOCUMENT